UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| KATHLEEN JOYCE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:10-cv-00310-JAW |
| | ) | |
| POSTMASTER GENERAL, | ) | |
| UNITED STATES POSTAL SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM DECISION**

In this bench trial, the Court finds that although the Postal Service's hiring process for Mail Handler positions in 2008 was surprisingly irregular and ad hoc, there is no evidence that its decision not to hire a fifty-one year old applicant was in any way related to her age. The Court issues judgment on the Age Discrimination in Employment Act count for the Postmaster General of the United States Postal Service and against the Plaintiff.

## I.    BACKGROUND

On July 26, 2010, Kathleen Joyce filed a complaint against the Postmaster General of the United States Postal Service, alleging that the Postal Service discriminated against her on the basis of her age, sex, and disability when it declined to hire her as a Mail Handler. *Compl.* (ECF No. 1). On February 28, 2012, the Court granted summary judgment on the disability discrimination claim. *Order on Mot. for Summ. J.* (ECF No. 35). The case proceeded to trial on the age and sex discrimination claims on May 23, 2012, and on May 25, 2012, a jury issued

a verdict against Ms. Joyce on both claims. *Jury Verdict Form* (ECF No. 79). As the Age Discrimination in Employment Act (ADEA) does not provide the right to trial by jury in a claim against the Postal Service, the jury verdict on that count is advisory. FED. R. CIV. P. 39(c); *see Lehman v. Nakshian*, 453 U.S. 156, 168 (1981); *In re Young*, 869 F.2d 158, 159 (2d Cir. 1989). Following the verdict, the parties submitted proposed findings of fact and conclusions of law on Ms. Joyce's ADEA claim. *Pl.'s Proposed Findings of Fact and Conclusions of Law* (ECF No. 86) (*Pl.'s Findings*); *Def.'s Proposed Findings of Fact and Conclusions of Law* (ECF No. 87) (*Def.'s Findings*). Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court is issuing its factual findings and legal conclusions and its verdict on the ADEA claim. FED. R. CIV. P. 52(a)(1).

## II.     FINDINGS OF FACT

### A.     The Witnesses

#### 1.     Kathleen Joyce

1)      At the time of her application to the Postal Service in 2008, Kathleen Joyce was fifty-one years old. *Tr. of Proceedings*, 22:15-22 (May 23, 2012) (ECF No. 84) (*Tr. 1*). Ms. Joyce was born and raised in Portland, Maine, attended Catholic schools, and graduated from Falmouth High School. *Id.* at 3:21-4:2.

2)      After high school, she attended college in Florida and then moved back to Maine one year after college. *Id.* at 4:1-3. As of the spring of 2012, she had lived in Falmouth for 23 years. *Id.* at 4:2-4.

3)      Ms. Joyce worked for the United States Postal Service from December 1983 to May 1987.  *Def.'s Ex. 1* (Application for Employment dated March 5, 2008); *Tr. 1* at 13:23-14:9.

4)      She started as a temp and was assigned where needed.  *Tr. 1* at 14:1-9. During her time with the Postal Service, she loaded sacks of mail, took sacks to trucks, and unloaded sacks.  *Id.*

5)      Beginning in 1997, Ms. Joyce worked in the town of Kennebunkport, Maine, running a restaurant for a couple of years.  *Id.* at 5:6-9.  After the restaurant owner lost his lease, Ms. Joyce went to work for a couple of seasons at another Kennebunkport restaurant, The Landing.  *Id.* at 5:8-13.  She then worked for some years at Sun 'n Surf in York, Maine.  *Id.* at 5:13-16.

6)      Between October 2001 and February 2008, Ms. Joyce had experienced six periods of unemployment: (1) October 2001 to December 2001; (2) October 2003 to July 2004; (3) December 2004 to February 2005; (4) December 2005 to February 2006; (5) December 2006 to February 2007; and (6) December 2007 to February 2008.  *Id.* 38:9-39:18.

### 2.   Lynn Bickford

7)      In 2008, Lynn Bickford was the general clerk in the Personnel Department at the Postal Service in Scarborough.[1]  *Tr. 1* at 62:21-24.

---

[1]      Ms. Bickford testified that she worked in the "Portland" office of the Postal Service.  *Tr. 1* at 62:8-14.  However, the Postal Service says that the Mail Handler position was at its Southern Maine Processing & Distribution Center in Scarborough, Maine.  *Def.'s Findings* at 4.  Although the location of the job is not material to the Court's decision, the Court assumes that the job would have been in Scarborough, not Portland.  When she referred to the Portland office, Ms. Bickford may have been using a short-hand phrase for the Southern Maine facility.

8)     Ms. Bickford was the primary point of contact for applicants for the Mail Handler positions at the Scarborough facility.  *Id.* at 62:25-63:8.  As part of the screening process, Ms. Bickford reviewed each application to alert the interviewer to potential areas of questioning.  *See id.* at 75:20-76:13.

9)     Ms. Bickford was not part of the selection process itself.  *Id.* at 77:4-9.

### 3.     Robert Burton

10)    Robert Burton, a supervisor at the Postal Service's Scarborough facility, was a certified interviewer and conducted the interview of Ms. Joyce.  *Tr. 1* at 119:15-120:16; 122:1-3.

11)    Mr. Burton was not originally scheduled to interview Ms. Joyce but was contacted a day or two before the scheduled interview and was asked to do the interview.  *Id.* at 126:19-127:3.  This was because of a scheduling conflict.  *Id.*  The Court finds that this change in interviewer was not related to Ms. Joyce's age.

### 4.     Ausilio Lombardi

12)    Ausilio Lombardi, supervisor of transportation operations at the Postal Service's Scarborough facility, was one of two persons who were responsible for interviewing and deciding who to hire for the Mail Handler positions in March 2008.  *Tr. of Proceedings*, 4:24-5:2, 6:18-24, 9:10-16 (ECF No. 85) (*Tr. 2*).

13)    Mr. Lombardi had been employed by the Postal Service since 1983 and was a certified interviewer.  *Id.* at 5:10-19.  Mr. Lombardi interviewed a number of candidates and after all the applicants had been interviewed, he met with Art Lent to discuss the candidates and make the selection.  *Id.* at 6:21-24, 9:10-16, 10:14-17.

### 5.    Arthur Lent

14)    By the time of the trial Arthur Lent had retired from the Postal Service. *Tr. 2* at 79:13-15.   In 2008, he worked for the Postal Service as supervisor of distribution operations at the Scarborough facility.  *Pl.'s Ex. 52,* ¶ 2 (Declaration of Arthur M. Lent).

15)    As of March 2008, Mr. Lent was a certified interviewer. *Tr. 2* at 80:4-6.  Mr. Lent interviewed some of the applicants for the Mail Handler positions, *id.* at 80:7-11, and with Mr. Lombardi, Mr. Lent selected the successful candidates.  *See id.* at 97:11-21.

### B.    Kathleen Joyce's Postal Service Application

### 1.    The Initial Application Process

16)    Ms. Joyce had applied a number of times for a Postal Service position.  *Tr. 1* at 51:21-23.  In November 2006, Ms. Joyce took a postal service battery examination and scored 80 on that exam.  *Id.* at 34:15-20.

17)    Sometime before February 2008, Ms. Joyce learned that the Postal Service was hiring part-time mail handlers.  *Id.* at 11:8-12:13.   Based on her prior experience with the Postal Service, Ms. Joyce thought she was qualified for the part-time position.  *Id.* at 14:10-13.  She obtained an application packet, filled it out, sent it in, and was contacted for an interview.  *Id.* at 16:16-19.  She received a letter informing her that her interview had been scheduled for a certain date and time, and was to be with Kathleen Fecteau.  *Id.* at 16:20-17:1.

5

18)     At the time of her application and interview, Ms. Joyce was in school.  *Id.* at 26:13-16.  In 2006, she had gone back to college at Southern Maine Community College and the University of Southern Maine.  *Id.* at 26:16-17.  She was completing the degree requirements for graduation from Saint Leo University where she had started.  *Id.* at 26:17-21.  She completed her degree in November-December 2009.  *Id.* at 26:23-25.

19)     The Postal Service application asked whether Ms. Joyce had been convicted of a crime.  *Id.* at 39:19-24.  Ms. Joyce checked "yes" and revealed a leaving the scene of an accident conviction, but she failed to list a disorderly conduct conviction.  *Id.* at 39:25-40:15.  She explained that she did not think the disorderly conduct conviction had been a criminal charge.  *Id.* at 40:8-18.  She also did not think she was required to put down an incident that had taken place thirty-five years ago.  *Id.* at 44:2-6.

20)     Despite the fact that the application defines a criminal conviction as including a misdemeanor, she also explained that she did not believe that the disorderly conduct misdemeanor conviction had to be disclosed.  *Id.* at 45:17-46:1.  Ms. Joyce also failed to disclose in the Postal Service application that she had been fired from a job at The Eagle's Nest restaurant in 1993.  *Id.* at 55:7-14.

## 2.     The Postal Service Interview

21)     When Ms. Joyce appeared for the interview, she was brought into a room and Robert Burton introduced himself as her interviewer.  *Id.* at 17:4-9.  She had never

met him before.  *Id.* at 17:10-12.  Mr. Burton had paperwork before him and as the interview progressed, he checked off and initialed questions.  *Id.* at 17:15-18.

22)   The application had asked Ms. Joyce whether she had ever been fired from a job and she confirmed that she had.  *Id.* at 18:19-24.  She had written a note of explanation on the application.  *Id.*  Mr. Burton asked her about the firing.  *Id.* at 29:14-17.  Ms. Joyce explained to Mr. Burton that she had worked at an employer, known as Val Halla Golf Course, for a few months, and she had found it a really bad place to work.  *Id.* at 19:16-18, 37:5-8.  She thought the manager was not very nice and she had decided to quit.  *Id.* at 19:18-19.  In fact, she already had gotten another job.  *Id.* at 19:19-20.  She explained to Mr. Burton that she had been called into the office and was going to quit, but instead was fired.  *Id.* at 20:5-9.  She said that Mr. Burton seemed to understand.  *Id.* at 20:10-15.  The termination incident occurred in June or July 2000.  *Id.* at 37:9-10.

23)   The application also asked Ms. Joyce whether she had a criminal record.  *Id.* at 20:16-19.  She acknowledged in the application that she had been convicted of leaving the scene of an accident.  *Id.* at 20:19-21.  She told Mr. Burton that she had been at a construction site and she had bumped the car in front of her.  *Id.* at 21:6-8. She and the other driver got out of their cars and observed no damage.  *Id.* at 21:8-10.  They did not exchange personal information.  *Id.* at 21:10-11.  Later, the other driver discovered a nickel-size dent and Ms. Joyce was ticketed for leaving the scene of an accident because they had not exchanged information.  *Id.* at 21:11-18.

7

24)     During the interview, Ms. Joyce asked Mr. Burton whether he was aware that she was entitled to reinstatement rights because she had previously worked at the Postal Service.  *Id.* at 22:1-3.  Mr. Burton told her that she was not entitled to reinstatement rights.  *Id.* at 22:3.  Ms. Joyce "just let it go."  *Id.* at 22:3-4.

25)     At the end of the interview, she asked whether she would have to serve a probationary period since she had already worked for the Postal Service.  *Id.* at 22:4-6.  Mr. Burton informed her that she would have to serve either a sixty or ninety-day probationary period.  *Id.* at 22:4-9.  After this interchange, Mr. Burton said that he would not be using age either.  *Id.* at 22:19-21.  Thinking that at age fifty-one, she was not that old, she responded, "really?"  *Id.* at 22:21-22.  She estimated that the interview took about ten minutes.  *Id.* at 22:12-14.

### 3.     The Postal Service Rejection

26)     Her next contact with the Postal Service was in March when she received a rejection letter.  *Id.* at 23:24-25:3.  The rejection letter was from Mr. Burton and indicated that his decision did not reflect on her capabilities but represented his judgment in identifying and selecting candidates who best met the position requirements.  *Id.* at 24:17-21.  Based on the letter, she thought Mr. Burton was the person who had made the hiring decisions.  *Id.* at 24:22-24.

27)     Since the rejection in March 2008, Ms. Joyce had been working in the restaurant business, doing catering and banquets, *id.* at 26:3-9, and had sought more stable and challenging full-time employment.  *Id.* at 28:6-20.

### 4.     The Successful Candidates

8

28)    The successful candidates by name and age were Richard Renault, 62; Robert Kitch, 60; Paul Dean, 47; Michael Morin, 38; Tammy Glazier, 29; Rachel Stevenson, 29; Amanda Bouchey, 29; and Robert Samson, 25.  *Id.* at 83-84.  Ms. Joyce was 51 when she was not hired.  *Id.* at 84:9-11.

### 5.    Lynn Bickford's Role

29)    Lynn Bickford explained that when the Postal Service has an opening, she would typically review the persons who had passed a battery examination and would send those persons an application to complete and an interview date.  *Id.* at 63:13-64:4.  Once the application is received, she would review a checklist to make sure it is complete.  *Id.* at 64:5-9.  The Postal Service does a criminal background check on each applicant.  *Id.* at 64:10-25.  As part of the screening process, Ms. Bickford reviewed each application to alert the interviewer to potential areas of questioning.  *See id.* at 75:20-76:13.

30)    Ms. Bickford explained why Kathleen Joyce was interviewed by Mr. Burton instead of Ms. Fecteau.  *Id.* at 78:1-20.  The Portland Postal Service facility has 800 employees and a number of supervisors are trained as certified interviewers.  *Id.* at 78:1-5.  If one certified interviewer is needed elsewhere, Ms. Bickford will turn to another interviewer; she considers the interviewers interchangeable.  *Id.* at 78:5-20.  Some interviewers, like Arthur Kent and Ausilio Lombardi, are more experienced, and some, like Mr. Burton and Ms. Fecteau, are less so.  *Id.* at 78:21-79:12.  Ms. Bickford also acknowledged that either Mr. Kent or Mr. Lombardi interviewed Tammy Glazier, Robert Kitch, Rachel Stevenson, Robert Samson, Richard Renault,

Amanda Bouchey, Paul Dean, and Michael Morin.  *Id.* at 79:13-18.  Ms. Bickford confirmed that there were eight jobs available and that fifteen persons were selected for interviews; however, not all those invited to an interview followed through.  *Id.* at 82:21-83:8.

### 6.   Robert Burton's Interview

31)   Robert Burton conducted the interview of Ms. Joyce.  *Tr. 1* at 122:1-3.  Mr. Burton was not originally scheduled to interview Ms. Joyce but was contacted a day or two before the scheduled interview and was asked to do the interview.  *Id.* at 126:19-127:3.

32)   In terms of preparation, he may have talked to Mr. Lombardi "the night before or something" and was told that he had to be sure to ask the checklist questions because the interviewer has to "hit certain points and ask certain things." *Id.* at 126:21-127:10.

33)   When Ms. Joyce arrived, there was "a pleasant greeting."  *Id.* at 124:24-125:1.  He had a "checklist" to guide the interview and the checklist required him to verify that the person being interviewed was the person who applied.  *Id.* at 125:1-4. To this end, the Postal Service required "a couple forms of ID, change of address verif[ication]."  *Id.* at 125:4-6.  Ms. Joyce did not have verification of one of the items, perhaps her address, and he told her he needed to speak with Lynn Bickford to see if it was okay for her to ship it or bring it in later.  *Id.* at 125:19-24.  When Mr. Burton asked Ms. Joyce for her date of birth, she "kind of sat back and, you know, put her head back and looked at me like, why are you asking me this."  *Id.* at

127:20-23.   He explained that it was "a form of verification," yet it "felt pretty uncomfortable at that point in the interview, because she sat back and she was kind of drawn back." *Id.* at 127:23-128:3.

34)   There was another point when Ms. Joyce questioned Postal Service policy regarding a probationary period. *Id.* at 128:4-5. He thought she would have to serve another probationary period and Ms. Joyce told him, "no, you're not right, you don't know what you're talking about, you need to check in on that." *Id.* at 128:5-9. Mr. Burton said that that was "kind of the nuts and bolts of the uncomfortable." *Id.* at 128:9-10.

35)   Ms. Joyce told him that she thought she was supposed to get "a different type of an interview than someone else that was coming in." *Id.* at 126:2-5. Ms. Joyce talked about "priority consideration," but Mr. Burton testified that he had "no clue before [he] came into the interview about what a priority consideration was." *Id.* at 126:5-8. He explained to Ms. Joyce that he was going to interview her "exactly how [he] interview[ed] every employee [he had] interviewed." *Id.* at 126:8-10. Ms. Joyce may have used the word "reinstatement"; however, he confessed that he would have had to go to personnel to find out "what that all means." *Id.* at 126:11-14. He told her he was there "just to conduct the interview, to point out stuff, and to ask questions." *Id.* at 126:17-19.

36)   Mr. Burton asked Ms. Joyce a number of questions about her application. Mr. Burton asked Ms. Joyce about her periods of unemployment and she told him the work was seasonal. *Id.* at 133:17-134:1. He asked her about her criminal

11

conviction.  *Id.* at 134:5-10.  She had been convicted of leaving the scene of an accident; he thought it was a misdemeanor but not disqualifying.  *Id.* at 134:11-16. He was comfortable with her explanation.  *Id.* at 135:1-5.

37)   Noting that her application revealed she had been fired from a job, Mr. Burton asked Ms. Joyce about her response because he was not certain whether she had been fired or was going to quit.  *Id.* at 135:6-16.  He testified that after hearing her explanation, he was still unsure and he thought she had not given a "very straightforward answer on that."  *Id.* at 134:16-19.  He felt she was "kind of skirting around the issue" and he was "not comfortable with her explanation" on that issue. *Id.* at 135:20-136:2.

38)   Ms. Joyce challenged Mr. Burton on her date of birth and the probationary period.  *Id.* at 128:11-17.  Overall, she had "started off well," but he had "never had an interview where [he] felt like [he] was being interviewed."  *Id.* at 128:18-129:2. Although he did not feel threatened by Ms. Joyce, he thought her body language in coming forward when she talked felt aggressive.  *Id.* at 131:1-10.

39)   There were several parts of Ms. Joyce's application that Mr. Burton did not cover with her during the interview.  Mr. Burton did not ask Ms. Joyce any questions about her volunteer activity and he thought her honors, awards and fellowships were not a "game breaker."  *Id.* at 132:24-133:13.  He did not talk with Ms. Joyce about her completing college later in life.  *Id.* at 133:14-16.

40)   After the interview, Mr. Burton spoke to Mr. Lombardi about his impressions of Ms. Joyce.  *Id.* at 130:7-9.  He told Mr. Lombardi that the interview

went "okay," but that he felt "a little uncomfortable" because he felt she was interviewing him and that was "uncomfortable." *Id.* at 130:10-14. He also told Mr. Lombardi that Ms. Joyce's body language seemed aggressive to him. *Id.* at 130:17-20. He passed her on, however, because he did not see anything disqualifying. *Id.* at 130:14-16. Mr. Burton made the recommendation because he viewed his mission as determining whether there were any disqualifying matters that would prevent her application from moving forward, and he had found none. *Id.* at 136:6-12.

41)     Mr. Burton did not make the decision as to which candidates to hire. *Id.* at 129:11-12. On March 17, 2008, Mr. Burton signed a letter to Ms. Joyce, informing her that she had not been selected. *Gov't's Ex.* 3. Although the letter states that the decision "represents my judgment in identifying and selecting the candidates who, I believe, best met the position requirements," *Gov't's Ex.* 3, Mr. Burton did not identify and select the candidates and did not make the adverse decision on Ms. Joyce. *Id.* at 137:9-22. Mr. Burton did not read the March 17, 2008 letter to Ms. Joyce before he signed it. *Id.* at 138:18-20.

### 7.     Ausilio Lombardi's Decision-Making

42)     Ausilio Lombardi testified on May 24, 2012. *Tr. 2* at 1, 4. Mr. Lombardi, the supervisor of transportation operations at the Postal Service's Scarborough facility, has been in charge of all the larger trucks, box trucks, and cargo vans that deliver mail from post office to post office. *Id.* at 4:24-5:6. Mr. Lombardi has been a certified interviewer since 1988; to be a certified interviewer, Mr. Lombardi attended a one-day training course. *Id.* at 5:17-6:5. In his capacity as a certified

interviewer, Mr. Lombardi annually interviewed approximately fifteen to twenty applicants, sometimes more. *Id.* at 6:9-12.

43)    Mr. Lombardi conducted some Postal Service interviews for nondriving positions in March 2008. *Id.* at 6:21-24. Shortly after the interviews were completed, Mr. Lombardi and Mr. Lent met to make the hiring decisions. *Id.* at 9:25-10:17; 12:3-10. Mr. Lombardi talked to Mr. Burton about his interview of Ms. Joyce and heard from him that she was at times "overly aggressive" and "seem[ed] to question his interviewing abilities" during the interview. *Id.* at 13:9-15:2.

44)    Regarding the fact that Mr. Lombardi and Mr. Lent interviewed all the applicants except Ms. Joyce, Mr. Lombardi agreed that it would lead to fairer results to have one person do all the interviews. *Id.* at 18:8-12. He also agreed that although Mr. Burton interviewed Ms. Joyce, Mr. Burton did not have a decision-making role in hiring. *Id.* at 18:21-25.

45)    In terms of their evaluation of the applicants, Mr. Lombardi and Mr. Lent set up a system of three characteristics, called strikes. *Id.* at 19:14-18. The three strikes were: (1) prior criminal charges; (2) prior firing; and (3) pattern of erratic employment. *Id.* at 19:19-24. Mr. Lombardi had always used this three-strike system since becoming a certified interviewer. *Id.* at 19:25-20:8. Whether all three strikes were weighed equally depended "upon the circumstances." *Id.* at 20:9-14. Other factors considered by Mr. Lombardi and Mr. Lent included trust, attendance record, and safety record. *Id.* at 21:3-16.

14

46)     Mr. Lombardi concluded that Ms. Joyce had all three strikes against her application: a prior criminal record, having been fired from a job, and an erratic work history.  *Id.* at 26:2-7.  He based the criminal conviction conclusion on the leaving the scene of an accident conviction.  *Id.* at 26:9-12.  Mr. Lombardi thought that leaving the scene of an accident was "a little sneaky," but he did not know the circumstances of her accident.  *Id.* at 27:24-28:9.

47)     Regarding the second strike—having been fired for cause, Mr. Lombardi concluded that she had been fired for cause despite the fact Ms. Joyce's application revealed that she was about to quit due to severely bad working conditions.  *Id.* at 32:11-15.  He thought her explanation was "BS," was not true, and was "an excuse." *Id.* at 32:16-25.

48)     Turning to the third strike—erratic work history—Mr. Lombardi thought Ms. Joyce's work history was "extremely erratic" when compared with other applicants.  *Id.* at 36:1-6.  Mr. Lombardi viewed her work history as cyclical, reflecting work for several months, a period collecting unemployment benefits, work for several months, and unemployment benefits.  *Id.* at 38:5-10.  Mr. Lombardi understood the nature of tourist-fueled seasonal employment in Maine.  *Id.* at 38:17-19.  He considered whether her work history reflected employment for businesses that close in the winter, but he concluded that "it looked like she would work, collect unemployment, work, collect unemployment, work, collect unemployment."  *Id.* at 38:20-39:2.  He thought she was "using the system." *Id.* at 39:9-15.  Mr. Lombardi had never spoken to Ms. Joyce and had never questioned

her about her work history. *Id.* at 39:16-20. He assumed that when her application stated that she was unemployed, she was collecting unemployment; however, he had no actual information that she was doing so. *Id.* at 40:20-41:14.

49)   Mr. Lombardi "made some mistakes" in an earlier affidavit. *Id.* at 45:5-8. He "filled out that affidavit in about 10 minutes, just throwing answers in there" and he did not "have any documents to go by at that point in time." *Id.* at 45:5-13. No one had placed any time limits on his preparation of the affidavit, but "it was a Friday." *Id.* at 45:14-16. Mr. Lombardi's mistakes included saying that no successful applicant had previously been fired from a job, when one successful applicant revealed that he had been fired. *Id.* at 44:23-45:8. Richard Renault, another successful applicant, indicated that he had been let go by a car dealership because of slow sales, but Mr. Lombardi did not count this as a firing because car sales were "really bad" in 2007 and the dealership had let him go because "there was just no work for him." *Id.* at 46:15-24. In other words, the applicant "didn't do anything wrong." *Id.* at 46:24. Another mistake in the affidavit was the number of candidates that Mr. Lombardi considered better suited for the position than Ms. Joyce. *Id.* at 73:24-77:20.

50)   Regarding prior criminal records, Paul Dean, a successful applicant, revealed that he had been convicted twice of operating after suspension and once for being a habitual offender. *Id.* at 50:20-55:1. Rachel Stevenson, another successful applicant, had a prior conviction for theft, which Mr. Lombardi agreed is a crime of dishonesty. *Id.* at 58:1-11. However, Mr. Lombardi did not hold this conviction

16

against Ms. Stevenson because she explained that she had a shopping cart filled with merchandise and inadvertently failed to remember that she had a vacuum cleaner on the bottom of the cart.  *Id.* at 59:23-60:16.  Given her explanation, Mr. Lombardi did not consider her behavior a crime; rather, he characterized it as a mistake, despite the fact she had been charged with theft and paid a fine.  *Id.* at 59:17-60:16.  In fact, Mr. Lombardi volunteered that even though he was not charged with a crime, "something very similar happened to [him]."  *Id.* at 60:13-20.

51)     Michael Morin, another successful applicant, had been convicted of three Class D crimes.  *Id.* at 61:21-24.  Mr. Lent interviewed Mr. Morin and Mr. Morin told Mr. Lent that the convictions stemmed from a relationship problem he was experiencing when he was breaking up with his then girlfriend.  *Id.* at 62:15-63:15.  Mr. Morin said that he had learned a great life lesson and, having heard his explanation, neither Mr. Lent nor Mr. Lombardi had an issue with these convictions.  *Id.* at 63:11-21.  Mr. Lombardi was unaware that Mr. Morin was convicted of assault for which he served forty-five days in jail.  *Id.* at 65:14-66:4.

52)     Mr. Lombardi and Mr. Lent considered Ms. Joyce's application along with the others.  *Id.* at 114:23-115:5.  Neither Mr. Lombardi nor Mr. Lent considered Ms. Joyce's age as a factor in their decision-making.  *Id.* at 115:11-16.  They were aware of the fact she had been fired from a previous job.  *Id.* at 116:8-16.  They were also aware of her periods of unemployment and Mr. Lombardi considered these periods of unemployment to represent an erratic work history.  *Id.* at 116:17-118:17.  They were aware of her prior criminal conviction and Mr. Lombardi considered that

17

conviction to be sneaky. *Id.* at 118:18-119:12. Mr. Burton had told Mr. Lombardi that Ms. Joyce had been aggressive or combative during her interview. *Id.* at 119:13-120:2. Mr. Lent told Mr. Lombardi that he remembered that back in the 1980s, when Ms. Joyce was employed by the Postal Service, she had attendance problems. *Id.* at 120:8-17. They took each of these five factors—prior firing, erratic work history, prior conviction, aggressiveness at the interview, and prior attendance problems—into account when making their decision not to hire Ms. Joyce. *Id.* at 120:22-121:2. Mr. Lombardi learned after the hiring decision had been made that Ms. Joyce's attendance problems in the 1980s were caused by an injury that had kept her out of work. *Id.* at 160:23-161:13.

53) Mr. Lombardi and Mr. Lent did not hold Amanda Bouchey's period of unemployment against her because her period of unemployment took place when she was raising a young family. *Id.* at 121:22-122:17. Ms. Bouchey had not been fired from any previous jobs and did not have any prior criminal convictions. *Id.* at 122:19-25. They decided to hire her. *Id.* at 121:19-21.

54) Mr. Lombardi did not consider Paul Dean's employment history to indicate erratic employment. *Id.* at 123:17-126:24. Although Mr. Lombardi considered Mr. Dean's criminal history, he also took into account the fact that Mr. Lent was satisfied with Mr. Dean's explanation. *Id.* at 126:25-128:8. Mr. Lombardi was aware of Mr. Dean's status as a veteran, including his ten years of service in the United States Navy, his honorable discharge, and the fact he was a five-point veteran. *Id.* at 128:9-129:3. Mr. Lombardi also considered Mr. Lent's positive

description of Mr. Dean from Mr. Lent's interview: that Mr. Dean was a "standup guy." *Id.* at 129:7-17.

55)     Regarding Tammy Glazier, another successful candidate, Mr. Lombardi took into consideration the fact that she had not been previously fired and had no prior convictions. *Id.* at 130:8-14. She had no periods of unemployment during the ten years before her application and Mr. Lombardi and Mr. Lent concluded that she did not have an erratic work history. *Id.* at 132:6-12.

56)     Regarding Robert Kitch, another successful candidate, Mr. Lombardi took into consideration the fact that he had not been previously fired. *Id.* at 133:6-10. Although Mr. Kitch checked that he had previously been convicted, it turned out that he had to pay a fine for parking on the wrong side of the street and Mr. Lombardi did not consider that parking ticket to be a criminal conviction. *Id.* at 133:11-22. Mr. Kitch had been laid off for a few months in 2007, but he otherwise had a steady employment history and Mr. Lombardi did not consider his work history to be erratic. *Id.* at 133:23-136:24. Mr. Kitch was a five-point veteran, having been honorably discharged by both the Army and the Navy. *Id.* at 136:12-137:9.

57)     Mr. Lent interviewed Michael Morin and liked him a lot. *Id.* at 137:11-23. Mr. Lombardi went with Mr. Lent's good judgment. *Id.* Mr. Morin had never been fired. *Id.* at 138:4-5. He did have a prior conviction, which counted against him, but Mr. Lombardi accepted Mr. Morin's explanation and his remorse. *Id.* at 138:6-22. Mr. Lombardi did not count against Mr. Morin his period of unemployment

19

when he was a stay-at-home dad. *Id.* at 139:7-11. Furthermore, during that time, he was managing his own apartment building. *Id.* at 139:14-15. Mr. Lombardi did not consider Mr. Morin's employment history erratic. *Id.* at 141:6-8.

58)     Mr. Lombardi interviewed Richard Renault, another successful candidate. *Id.* at 141:23-142:3. Mr. Renault had been laid off from Maine Mall Motors in January 2007 due to slow sales. *Id.* at 142:4-14. He had previously been working at Maine Mall Motors for nine years. *Id.* at 142:19-23. Mr. Lombardi did not consider Mr. Renault's employment history erratic. *Id.* at 143:23-25. Although Mr. Renault marked on his application that he had been fired, he was referring to being laid off due to slow sales and Mr. Lombardi did not hold that against him. *Id.* at 144:5-20. Mr. Renault had no prior convictions. *Id.* at 144:21-23. He was a ten-point Vietnam veteran and had been awarded a Purple Heart, which played a role in Mr. Lombardi's decision to hire him. *Id.* at 144:24-145:21.

59)     Mr. Lombardi interviewed Robert Samson, another successful candidate. *Id.* at 145:23-25, 146:8-9. Mr. Samson had never been fired and had no criminal convictions. *Id.* at 146:10-15. Mr. Samson's periods of unemployment coincided with his time in college. *Id.* at 146:16-149:17. Mr. Lombardi did not hold that against him and did not consider his work history erratic. *Id.* at 149:18-22.

60)     Mr. Lombardi interviewed Rachel Stevenson, another successful candidate. *Id.* at 150:1-5. Ms. Stevenson was already working for the Postal Service in Augusta, Maine, when she applied. *Id.* at 150:12-16. Ms. Stevenson had never previously been fired; she had been laid off in 2006 due to a restructuring. *Id.* at

20

150:22-151:9.  Mr. Lombardi did not consider the lay-off to be a firing.  *Id.* at 151:10-11.  Ms. Stevenson revealed her prior conviction for theft in 2002.  *Id.* at 151:21-152:6, 153:10-14.  Mr. Lombardi accepted her explanation about forgetting to pay for something on the bottom of her shopping cart.  *Id.* at 152:12-25.  He credited her explanation that it had been a mistake despite the fact that Ms. Stevenson had been a department manager for Wal-Mart.  *Id.* at 166:13-167:12.  He also noted that she had been hired by the Postal Service after her conviction.  *Id.* at 153:15-17.  Nevertheless, he considered her as having a prior conviction.  *Id.* 153:1-3.  Mr. Lombardi also spoke to Lynn Pierce, Ms. Stevenson's supervisor, who gave Mr. Stevenson an excellent recommendation, and this recommendation influenced his hiring decision.  *Id.* at 154:3-19.  Ms. Stevenson did not present an erratic work history.  *Id.* at 157:1-3.

### 8.   Arthur M. Lent's Decision-Making

61)   Arthur M. Lent is a retired Postal Service employee.  *Id.* at 79:10-15.  He retired in June 2009 after working for the Postal Service for twenty-five years.  *Id.* at 79:16-22.  He was a certified interviewer in March 2008 and interviewed candidates for the mail handler positions at that time.  *Id.* at 80:4-11.

62)   Michael Morin, the candidate with Class D convictions, explained his conduct by saying that he never physically assaulted anyone; he only verbally assaulted a person.  *Id.* at 91:12-18.  Mr. Morin had explained that he was younger when it happened, that it was "immature on [his] part," and that he "should have kept [his] mouth shut and stayed away from it all."  *Id.* at 91:19-21.  Mr. Lent was

satisfied by Mr. Morin's explanation that the episode was "more like a teenage thing of jealousy." *Id.* at 92:5-14, 92:25-93:4. Mr. Lent was aware that at the time of the assault, Mr. Morin was twenty-seven years old. *Id.* at 92:18-23. Mr. Lent accepted the candidate's statement that his assault conviction was not physical; otherwise, Mr. Lent would have changed his mind because the Postal Service has a "zero tolerance" policy against physical touching. *Id.* at 92:25-93:10.

63)     Mr. Lent did not speak to Mr. Burton about Ms. Joyce. *Id.* at 93:16-94:2. Asked about Ms. Joyce's leaving the scene of an accident conviction, Mr. Lent thought she should not have been driving at the time of the motor vehicle accident because she did not have automobile insurance at the time. *Id.* at 94:12-22. Mr. Lent agreed that this was one of the factors that he weighed when deciding not to extend an offer to Ms. Joyce. *Id.* at 96:14-16.

64)     One other factor in Mr. Lent's decision was that in 1986, when Ms. Joyce worked for the Postal Service, Mr. Lent had noticed that she had an attendance problem and he recalled that problem when he made the decision on her 2008 application. *Id.* at 95:16-25.

65)     Regarding Paul Dean, Mr. Lent did not think his criminal history was a serious matter. *Id.* at 100:19-101:13. By contrast, Mr. Lent weighed Mr. Dean's status as a veteran in his favor. *Id.* at 101:23-102:5.

66)     Returning to Michael Morin and his convictions, Mr. Morin offered a statement of remorse and Mr. Lent concluded, due to Mr. Morin's age at the time of

the convictions, that Mr. Morin's actions represented a foolish youthful mistake.  *Id.*
at 102:6-103:12.

## III.   DISCUSSION

### A.   Legal Standards Under the ADEA

Under the ADEA, the United States Postal Service must make hiring
decisions about potential employees who are at least forty years old "free from any
discrimination based on age."  29 U.S.C. § 633a(a).  The ADEA makes it unlawful
for any employer "to fail or refuse to hire . . . any individual . . . because of such
individual's age."  *Id.* § 623(a)(1).  The United States Supreme Court has
interpreted this language to require that "where . . . a plaintiff claims age-related
'disparate treatment' (i.e., *intentional* discrimination 'because of . . . age') the
plaintiff must prove that age '*actually motivated* the employer's decision.'"
*Kentucky Retirement Sys. v. EEOC*, 554 U.S. 135, 141 (2008) (quoting *Hazen Paper
Co. v. Biggins*, 507 U.S. 604, 610 (1993)) (emphasis in *Kentucky Retirement*).  The
Supreme Court has further explained that the ADEA's text does not authorize an
alleged mixed-motives age discrimination claim.  *Gross v. FBL Fin. Servs., Inc.*, 557
U.S. 167, 175 (2009).  Thus, "[t]o prevail on an ADEA claim, an employee must
establish by a preponderance of the evidence that age was the but-for cause of [the
personnel action]."  *Cruz v. Bristol-Myers Squibb Co.*, 699 F.3d 563, 570 (1st Cir.
2012).

"Where, as here, the [plaintiff] lacks direct evidence, [courts] utilize the
burden-shifting framework developed by the Supreme Court to facilitate the process

of proving discrimination." *Id.* (quoting *Bonefont-Igaravidez*, 659 F.3d 120, 123 (1st Cir. 2011)).   Under that framework, to establish a prima facie case of age discrimination in a failure to hire claim, Ms. Joyce must show (1) that she was at least forty years old at the time of the failure to hire, (2) that she was qualified for the position, (3) that she was not hired, and (4) that the employer did not treat age neutrally or filled the position or positions with younger people of similar qualifications. *See id.* at 571 (describing the framework in the context of an alleged discriminatory reduction in force); *Velez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 441, 447 (1st Cir. 2009) (describing the framework in the context of an alleged discriminatory firing).   The First Circuit has described this prima facie burden as "modest" and a "low standard."   *Velez*, 585 F.3d at 447 (quoting *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 71 (1st Cir. 2004) and *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44 (1st Cir. 2002)).

If the plaintiff makes out a prima facie case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the [failure to hire]." *Cruz*, 699 F.3d at 571; *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995).

"If the employer articulates such a reason, 'the *McDonnell Douglas* framework—with its presumptions and burdens—is no longer relevant.'" *Velez*, 585 F.3d at 447 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510 (1993)).   At this stage, "the sole remaining issue [is] discrimination *vel non.*" *Id.*   The plaintiff must prove by a preponderance of the evidence that "the legitimate reasons offered

24

by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* at 447-48 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). "Ultimately, the plaintiff's burden is to prove 'that age was the 'but-for' cause of the employer's adverse action.'" *Id.* at 448 (quoting *Gross*, 557 U.S. at 180).

### B. Kathleen Joyce's Prima Facie Case

The Court concludes that Kathleen Joyce has met her burden to establish a prima facie case of age discrimination against the Postal Service. In March 2008, Ms. Joyce was over 40 years old; she was qualified for the position; she was not hired; and the Postal Service filled six of the eight positions with people younger than Ms. Joyce, five of whom were under forty.

### C. Legitimate Nondiscriminatory Reason

The Court concludes that the Postal Service easily meets the requirement that it come forward with a legitimate, nondiscriminatory reason for its decision not to hire Ms. Joyce. The three strikes used by the decision-makers to evaluate the applicants—prior convictions, erratic work history, and prior firing—are facially neutral and are legitimate areas of concern for potential employers. *See, e.g., Hopkins v. Blommer Chocolate Co.*, No. 02-5335 EDL, 2003 WL 22416474, at *4 (N.D. Cal. Oct. 14, 2003) (holding that employer's concerns about applicant's extensive criminal record and unstable work history were legitimate and nondiscriminatory reasons for not hiring candidate); *Turner v. City of Philadelphia Office of the Controller*, Civil Action No. 96-8570, 1997 U.S. Dist. LEXIS 20807, at *13-15 (E.D. Pa. Dec. 30, 1997) (applicant plaintiff's argument that the employer

"should not have considered the plaintiff's termination from a previous job [wa]s meritless" where applicant had been fired from a previous job and "did not provide a clear explanation as to why she had been dismissed"); *Hawkins v. Mary Hitchcock Mem'l Hosp.*, 22 F. App'x 21, 22 (1st Cir. 2001) ("Here, the employer's stated reasons—poor references, *an erratic work history*, and the like—are legitimate on their face, and the plaintiff's attempt to explain away those data, whether or not persuasive, does not vitiate the employer's right to rely on them") (emphasis added).

By the assessment of Messrs. Lombardi and Lent, Ms. Joyce had all three strikes against her—prior firing, erratic work history, and prior criminal conviction. In addition, Mr. Burton, her interviewer, reported to Mr. Lombardi that she appeared aggressive or combative during her interview and Mr. Lent recalled that when Ms. Joyce worked for the Postal Service, she had had attendance problems. These five reasons, individually and cumulatively, readily carry the Postal Service's burden of production.

### D.   Kathleen Joyce's Evidence of Discrimination

The case reverts to a standard burden of proof case: whether Kathleen Joyce has demonstrated that it is more likely than not that age was the but-for cause of the Postal Service's negative hiring decision.  The Court concludes that she has failed to meet her burden.

#### 1.   Kathleen Joyce's Case: An Overview

First, there is no direct evidence of discrimination based on age: the decision-makers made no age-based comments and no selection criteria were related to age.

26

Second, the Postal Service did not just hire younger applicants. Three of the successful candidates were above the age of forty; two were in their sixties and older than Ms. Joyce and one was forty-seven, four years younger than her. Thus, the Postal Service selection process resulted in the hiring of some workers over forty years old, just not Ms. Joyce.

Third, as the Court has already noted, the three strikes that Mr. Lombardi and Mr. Lent used to evaluate applicants were legitimate and non-discriminatory considerations. Ms. Joyce makes no claim that older workers are more likely to have previously been fired, to have committed criminal offenses, or to have an erratic work history than younger workers.

Fourth, Mr. Lombardi and Mr. Lent concluded that Ms. Joyce had all three strikes against her. Although Ms. Joyce contests the way Mr. Lombardi and Mr. Lent viewed her prior firing, her criminal conviction, and her seasonable work history, there is no evidence that either Mr. Lombardi or Mr. Lent based their assessments of these matters on her age.

Fifth, Mr. Lombardi and Mr. Lent took into account two further factors specific to Ms. Joyce. The first is that she appeared aggressive during her interview with Mr. Burton, making him uncomfortable. The second is that Mr. Lent recalled she had attendance problems during the 1980s when she worked for the Postal Service. Neither of these factors is age-based and there is no evidence Mr. Lombardi or Mr. Lent considered Ms. Joyce's age in their decision not to hire her.

Sixth, there has been no attempt to present a statistical argument, attempting to demonstrate that the composition of the Postal Service workforce in Scarborough reflects a pattern of discriminatory hiring.

In short, there is a paucity of evidence that age had anything to do with the Postal Service's failure to hire Ms. Joyce.

### 2.   The Comparable Employees

Ms. Joyce complains about the way the Postal Service handled the applications of Richard Renault, Robert Kitch, and Paul Dean, ages 62, 60, and 47 respectively.  *Pl.'s Findings* at 10, 17.  Ms. Joyce maintains that Mr. Lent did not hold Mr. Renault's work history against him, even though he had been laid off a couple of times due to an economic downturn.  *Id.* at 10.  But he did consider Ms. Joyce's seasonal work to be erratic, even though, according to Ms. Joyce, her seasonal work reflected the seasonal nature of the Maine economy.  *Id.* Furthermore, Ms. Joyce points out that Mr. Lombardi and Mr. Lent did not count the car dealership's termination of Mr. Renault against him as a strike and yet they counted Ms. Joyce's firing against her.  *Id.* at 10-11.

Ms. Joyce has a milder complaint about the way Mr. Lombardi and Mr. Lent treated Mr. Kitch.  She concedes that "Kitch, a 10-point Veteran who had no strikes, . . . was virtually assured of the job."  *Id.* at 17.  At the same time, she complains that Messrs. Lombardi and Lent "overtly favored the Veterans in the group."  *Id.*

Ms. Joyce is particularly critical of the way Mr. Lombardi and Mr. Lent evaluated Mr. Dean's application.  Ms. Joyce complains that Mr. Lombardi and Mr.

Lent did not hold Mr. Dean's convictions for operating after suspension and for being an "habitual offender" against him, but held her leaving the scene of an accident conviction against her. *Pl.'s Findings* at 5-8. She also points out that Mr. Lombardi and Mr. Lent did not apply an erratic work history strike against Mr. Dean even though he had listed nine jobs in eleven years; yet, they held Ms. Joyce's seasonal employment and her tenure as a full-time student against her. *Id.* at 9-10. Finally, she attacks Mr. Lombardi's and Mr. Lent's failure to consider Mr. Dean's firing for excessive absences as a strike despite holding her "I quit—you're fired" termination against her. *Id.* at 10-11.

The analytic flaw with Ms. Joyce's contentions regarding Messrs. Renault, Kitch, and Dean is that she is attempting to prove age discrimination by asserting that the Postal Service favored applicants not substantially younger than she was. In *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996), the Supreme Court held that that the replacement of one worker by another worker "insignificantly younger" does not support an inference of age discrimination, and said that "the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *Id.* at 313. Following *O'Connor*, the First Circuit addressed this issue in *Williams v. Raytheon Co.*, 220 F.3d 16 (1st Cir. 2000), and agreed with other circuits that "an age difference of less

29

than five years is insufficient to support a prima facie case of age discrimination."[2] *Id.* at 20.

Here, proof that Mr. Lombardi and Mr. Lent unreasonably favored Mr. Renault and Mr. Kitch, both of whom were in their sixties and older than Ms. Joyce, hardly supports her claim that they discriminated against her due to her age.  Nor does proof that they favored Mr. Dean help her case, as Mr. Dean was only four years younger than Ms. Joyce and fell within the statutorily protected class of over forty years old.  *See Williams*, 220 F.3d at 20.

### 3.    Hiring Irregularities

Ms. Joyce's strongest point is that the Postal Service's hiring process was irregular.  She has demonstrated that the Postal Service's procedure had a number of flaws.  However, she has not demonstrated that these flaws were in any way related to age.

### a.    No Standard Practice To Deviate From

The Postal Service concedes that under First Circuit law, "pretext can be demonstrated through a showing that an employer has deviated inexplicably from one of its standard business practices."  *Kouvchinov v. Parametric Tech. Corp.*, 537 F.3d 62, 69 (1st Cir. 2008).  There is substantial evidence that the Postal Service hiring procedure was oddly unstandardized.  Mr. Lombardi and Mr. Lent seemed to

---

[2]    The *O'Connor* and *Williams* Courts held that an insignificant age difference cannot support a prima facie case of age discrimination.  Given that the prima facie burden has been described by the First Circuit as "modest," *Velez*, 585 F.3d at 447, and a "low standard," *Zapata-Matos*, 277 F.3d at 44, it follows that in the context of Ms. Joyce's ultimate burden—proving that age was the but-for cause of her failure to be hired—the Postal Service's favorable treatment of an insignificantly younger applicant holds even less probative value.

create from whole cloth many of the critical criteria by which they evaluated the candidates, a surprisingly ad hoc and personalized approach for an employer as large and sophisticated as the Postal Service.

Regarding the three strikes criteria, Mr. Lombardi testified that he created the three strikes based on his experience as a certified interviewer and there is no evidence that he and Mr. Lent were applying Postal Service-wide standards. Although there is nothing discriminatory about the three criteria, the notion that decision-makers within the Postal Service would invent and apply their own hiring standards is remarkable. Nevertheless, as the First Circuit wrote in *Kouvchinov*, "where an employer's approach to personnel matters is flexible or discretionary, there is by definition no standard practice from which to deviate." *Id.* at 69. The Court concludes that Ms. Joyce has not established that the Postal Service had a standard set of criteria by which to judge applicants for the mail handler position or that, in setting their own standards, the decision-makers deviated improperly from those standard practices.

### b.    Personalizing the Hiring Process

Ms. Joyce's evidence has revealed a hiring process that was occasionally personalized by the decision-makers. Both Mr. Lombardi and Mr. Lent were impressed with candidates who shared some of their own life experiences. For example, Mr. Lombardi did not hold Ms. Stevenson's theft conviction against her when she failed to remember something at the bottom of her shopping cart because the same thing had happened to him. When asked about a candidate's status as a

veteran, Mr. Lent said that it was important to him because "number one, I'm a veteran myself." *Tr. 2* at 102:2-3. Mr. Lombardi confirmed that "Art [Lent] and I are both veterans and we kind of have a soft spot in our heart for veterans, but also veterans pretty much get preference." *Id.* at 128:16-21. Mr. Lent excused Mr. Morin's criminal history because he thought that "young people . . . have maturity problems, and even my own kids, some of them don't grow up until they're 30." *Id.* at 103:1-3.

These considerations did not taint the hiring process from a legal perspective. To give veterans a preference, for example, is consistent with the law. The seemingly arbitrary infusion of the decision-makers' personal experiences into the selection process had nothing to do with Ms. Joyce's age.

### c.   Correctable Mistakes

Another source of frustration for Ms. Joyce was that, having set their own hiring criteria, the decision-makers made inaccurate assumptions about whether she and the other applicants met them, and failed to properly investigate the accuracy of their assumptions.

The most egregious was the criminal history strike. Even though he later admitted that he knew "nothing" about the circumstances of Ms. Joyce's leaving the scene of an accident conviction, Mr. Lombardi swore in an affidavit that he thought Ms. Joyce had "crashed into somebody and [left] the scene of an accident." *Id.* at 28:7-30:3. Mr. Lent even assumed that the reason Ms. Joyce left the scene of an accident was that she did not have car insurance at the time and therefore violated

Maine driving laws.  *Id.* at 94:13-95:16.  There was no evidence that he was correct and his assumption contradicted Ms. Joyce's own description of the circumstances leading to her conviction.

By contrast, the decision-makers accepted Michael Morin's explanation of his criminal history based on a grossly inaccurate understanding of the legal significance of his assault conviction.  Mr. Morin was convicted not only of criminal threatening but of assault, and he spent forty-five days in Penobscot County Jail as a consequence of the assault.  *Id.* at 88:1-91:11.  Under Maine law, to be convicted of assault, a person must cause "bodily injury" or "offensive physical contact to another."   17-A M.R.S. § 207(1).   Yet, Mr. Lent simply accepted Mr. Morin's inaccurate explanation that "he never physically assaulted anybody.  It was verbal." *Tr. 2* at 91:12-24.   In addition, Mr. Lent testified that if Mr. Morin's assault conviction had been a physical assault, he would not have been hired because the Postal Service has a zero tolerance policy regarding employees touching each other. *Id.* at 93:4-7.  Mr. Lent also minimized Mr. Morin's assault conviction because it was "more like a teenage thing of jealousy" despite the fact that Mr. Morin was twenty-seven at the time of the conviction.  *Id.* at 92:5-22.

As earlier discussed, the decision-makers discounted Rachel Stevenson's theft conviction because the same type of thing had happened to Mr. Lombardi.  They also did not weigh Mr. Dean's convictions for operating after suspension and being a habitual offender against him because, according to Mr. Lent, they were "just driving offenses."  *Id.* at 84:6-8.  They were incorrect about Mr. Dean's operating

after suspension conviction, which was a Class E misdemeanor, 29-A M.R.S. § 2412-A, and about Mr. Dean's habitual offender conviction, which was either a Class D misdemeanor or a Class C felony.  29-A M.R.S. § 2557-A(2)(A), (B).

Ms. Joyce's irritation with the decision-makers' casual and erroneous assessment of the applicants' criminal histories is understandable.  However, there is no evidence at all that Mr. Lombardi and Mr. Lent committed these mistakes because of Ms. Joyce's age.

Similarly, the decision-makers viewed the candidates' work histories in an inconsistent manner.  They held Ms. Joyce's history of summer employment and winter lay-off against her on the assumption that she was drawing unemployment during the winter and was using the system.  Even though they conceded that the Maine economy has a strong seasonal element, the decision-makers held her seasonal employment against her, counting it as a strike.  By contrast, they did not hold Richard Renault's economy-based lay-off by Maine Motors against him.

Also, Ms. Joyce had been attending college in the years leading up to her application and they still found that she had an erratic work history.  The same decision-makers did not count Robert Samson's time in college against him for purposes of his work history.

Finally, Mr. Lent's recollection about her attendance problems decades before should have triggered some investigation to find out whether it was correct and, if so, whether there was an explanation.  But it did not.  The hiring decision was made

34

without Mr. Lombardi or Mr. Lent knowing that Ms. Joyce's absences during her prior period of employment were caused by a back injury.

Whatever else might be said about these inconsistencies and incomplete investigations, some more significant than others, there is no evidence that the failure of the decision-makers to be more thorough, accurate, and consistent was related in any way to Ms. Joyce's age.

### d.   Separate Interview

Ms. Joyce is suspicious about the fairness of the hiring process because she alone among the applicants was scheduled to interview with a person, Robert Burton, who was not a decision-maker.   Here, the Court agrees in part and disagrees in part with Ms. Joyce.   The evidence confirms that both Mr. Lombardi and Mr. Lent to some extent acted as advocates for the applicants who favorably impressed them during the interviews.   For example, according to Mr. Lombardi, Mr. Lent "liked [Michael Morin] a lot" and Mr. Lombardi "went with Art's good judgment." *Tr. 2* at 137:20-23.   Furthermore, she was not given the opportunity to explain the weaknesses in her application, such as the prior firing, her seasonal work history, and criminal conviction, to the people making the decision.

It is true that if Ms. Joyce had favorably impressed Mr. Burton, he would not have been present to advocate for her during the selection process.   But she did not favorably impress Mr. Burton.   Instead, Mr. Burton passed along to Mr. Lombardi his impression that she was aggressive during the interview and put him on the defensive.   If an interview had been held with either Mr. Lombardi or Mr. Lent and

35

if Ms. Joyce had appeared similarly aggressive, it is difficult to conclude that it would have improved her chances for being hired.  Moreover, there is no evidence that the scheduling of an interview with Mr. Burton was anything other than happenstance and no evidence that the scheduling had anything at all to do with Ms. Joyce's age.

### 4.   Summary

No hiring process is perfect and the Postal Service's hiring process for the mail handler jobs in 2008 fell short of what one would expect from an institution as large and sophisticated as the Postal Service.  The root of the problem seems to have been that the Postal Service gave over to employees who were trained interviewers the task of being human resource officers and making the ultimate decision.  There is no evidence that either Mr. Lombardi or Mr. Lent had any training in hiring and it appears that the Postal Service gave them little guidance on how to go about this sensitive task.  Accordingly, they made up their own criteria, did not disclose the critical criteria to the applicants, and applied the criteria unevenly based on inaccurate information and unsupported assumptions.

At the same time, the criteria they happened to select were proper and defensible.  Courts have routinely upheld the use of criminal histories, work histories, and prior firings in hiring decisions as neutral.  The additional considerations of her poor interview and her excessive absenteeism were also proper and neutral (even if, in the latter case, driven by a mistaken assumption).  Although the Postal Service's hiring process was irregular and ad hoc, there is no evidence

36

that the deficiencies in this case were in any way related to Ms. Joyce's age.  Her age discrimination case must therefore fail.

## IV.   CONCLUSION

The Court finds and concludes that Kathleen Joyce has failed to sustain her burden of proof to demonstrate by a preponderance of the evidence that her age was the but-for cause of the Postal Service's failure to hire her for a mail handler position in 2008.  The Court GRANTS judgment on Count One against Plaintiff Kathleen Joyce and in favor of the Postmaster General, United States Postal Service.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of January, 2013